PEYTON E. KIDD, Appellant, v. JOSEPH A. BREWER ET AL.
.—297 S. W. 960.

Division One, September 16, 1927.

1. **CONVEYANCE: Misdescription: Mutual Mistake: Reformation.** Where the grantor owned a lot 255 feet wide east and west, and agreed to convey all of it except the 125 feet on the east side, and both he and the grantee supposed the width was 250 feet, and the deed, instead of conveying all the lot except the east 125 feet, described the property conveyed by metes and bounds and began at the northwest corner and ran east 125 feet, thus omitting a strip five feet wide which the grantor had agreed to convey, and the mistake was mutual, the deed, where the rights of innocent purchasers do not intervene, should be reformed to conform to the agreement, and to include said five-foot strip.

2. ————: ————: **Innocent Purchaser: Quitclaim Deed.** A grantee in a quitclaim deed takes with notice that the land should have been included in the grantor's prior deed to another grantee, and stands in no better position than the grantor himself, and if the prior deed may be reformed as to the grantee named therein so as to include the omitted tract it can be so reformed as to the grantee in the later quitclaim deed.

3. ————: **Reformation: As to Parties and Later Grantees: Notice.** Prior to a later conveyance of an omitted tract, the grantee in a warranty deed has a right to have the deed reformed so as to carry out the intention of the parties thereto and to make the description extend to the boundary line as understood by them when the deed was made; and the remedy is available not only to the original parties, but to those claiming under them in privity, such as personal representatives, heirs, judgment creditors and purchasers with notice of the facts; and one who had notice of a fact which ought to have put him on inquiry, and which he might have discovered by using due diligence, cannot claim to be a purchaser without notice.

4. **CONVEYANCE: Reformation: Finding in Equity Suit.** In an equity suit the finding of the chancellor on conflicting evidence, and especially if based on oral testimony, and even though slightly against its weight, will not be disturbed on appeal, except for plain error. But if the proof is clear and convincing that the finding is erroneous, it will not be accepted on appeal, where the final determination of the rights of the parties must rest thereon.

5. ———: ———: **Innocent Purchaser: Notice: Omitted Strip.** The entire lot consisted of 6.88 acres, was 575 feet long north and south and was divided into two parts by a north-and-south center line, on which was a fence. Brewer owned the west part, which had an east-and-west width of 255 feet. He entered into a written agreement with Kidd to convey to him all the west part, except the northeast corner 125 feet wide and extending 300 feet south from the street. Both supposed Brewer's part to be 250 feet wide, and the deed, following the agreement, instead of describing the property as it was described in the agreement, described it by metes and bounds, and began at the northwest corner of the lot and extended eastward 125 feet, when in fact the east line of the property intended to be conveyed was 130 feet from the northwest corner, thus excepting in Brewer's favor the northeast corner 130 feet east and west and 300 feet north and south. A year later Brewer agreed to convey to Gregg the part retained by him, and the warranty deed described the property conveyed as beginning 125 feet east of the west line of the lot, "thence east 125 feet east to the north-and-south center line of said lot," the call thus failing to reach the center line by five feet. Afterwards Gregg caused a survey to be made, and discovering that there was a strip five feet wide, running north and south along the east side of the west part, which Brewer's deeds had not conveyed, induced Brewer to convey this strip by quitclaim deed to him. The evidence is fully reviewed, and it is **Held,** that Gregg bought with notice of the mistake in the deed from Brewer to Kidd, and that said deed should be reformed to be a conveyance to Kidd of all of the west part of the lot except the northeast corner extending 125 feet west from the center line and 300 feet south from the street, and that Brewer's deed to Gregg should be reformed to embrace only said northeast corner, and to extinguish his claim to the five-foot strip along the west side of the 130 feet which strip Brewer's deed to Kidd by mutual mistake permitted Brewer to retain.

Corpus Juris-Cyc. References: **Appeal and Error,** 4 C. J., Section 2867, p. 897, n. 81; Section 2869, p. 899, n. 95. **Reformation of Instruments,** 34 Cyc., p. 917, n. 87; p. 953, n. 87; p. 955, n. 7; p. 980, n. 4; p. 984, n. 34; p. 988, n. 37.

Appeal from Circuit Court of St. Louis County.—*Hon. J. W. Mc-Elhinney,* Judge.

REVERSED AND REMANDED (*with directions*).

*Robert C. Powell* for appellant.

(1) A written instrument will be reformed in equity to conform to the agreement and understanding of the interested parties, if there has been a mutual mistake made in the instrument. Kanan v. Hogan, 270 S. W. 646; Maze v. Boehm, 281 Mo. 507; Dougherty v. Dougherty,

204 Mo. 228; Henderson v. Beasley, 137 Mo. 199; Sicher v. Rambousek, 193 Mo. 113; Bartlett v. White, 272 S. W. 956. (2) A purchaser of certain premises is entitled to the reformation of a deed so as to convey to a line understood by the parties to be the boundary line at the time of the sale. Henderson v. Beasley, 137 Mo. 199. (3) The equitable remedy of reformation will not only be granted against the original parties and their heirs, but also as against their assignees, creditors, purchasers with notice and all others standing in privy. Sicher v. Rambousek, 193 Mo. 129. (4) One who has notice of a fact which ought to have put him on inquiry and which he might have discovered by using due diligence cannot claim to be an innocent purchaser without notice. Authorities under Points 2 and 3; Rhodes v. Outcalt, 48 Mo. 367; Association v. Arnett, 169 Mo. 201; Taafe v. Kelly, 110 Mo. 137; Mason v. Black, 87 Mo. 341. (5) To constitute a bona-fide purchaser it is necessary that such purchaser must have parted with value, and that he must have taken without notice, actual or constructive. Authorities, supra. (6) A quitclaim deed, given for the purpose of preventing a reformation and in fraud of the rights of those entitled to it, is not a good defense in a suit to correct a deed. Tabor v. Shattuck, 55 Mich. 370.

*H. Chouteau Dyer* for respondent Gregg.

(1) Respondent Gregg was a purchaser for value without notice. Story on Equity, sec. 165; Martin v. Nixon, 92 Mo. 35; Brown v. Gwin, 197 Mo. 499; Haley v. Bagley, 37 Mo. 363; Blumberry v. Mauer, 37 Tex. 1; Adams v. Stevens, 49 Me. 362; Dart v. Barbour, 32 Mich. 267. (2) The findings of the chancellor on conflicting evidence will not be disturbed on appeal. Tinker v. Kier, 195 Mo. 183; Huffman v. Huffman, 217 Mo. 182; Vaughn v. Vaughn, 251 Mo. 441; Walker v. Wallis, 186 S. W. 1041; Daudt v. Steiert, 205 S. W. 222. Even when the findings of the chancellor are slightly against the weight of the evidence, they will not be disturbed on appeal, except for plain error. Hunnell v. Zinn, 184 S. W. 1154; Creamer v. Bivert, 214 Mo. 473. (3) To warrant reformation of a deed in equity, the proof of mutual mistake must be clear and convincing and every presumption must be indulged in favor of the instrument as it is. Baumhoff v. Lochhaas, 253 S. W. 762; Chandler v. Hale, 268 S. W. 691; Frederick v. Henderson, 94 Mo. 98. (4) The facts in this case clearly do not warrant any imputation of notice to Gregg. Odle v. Odle, 73 Mo. 289; Dameron v. Lumber Co., 161 N. C. 495; Snyder v. Grandstaff, 96 Va. 473.

LINDSAY, C.—This is a suit to reform certain deeds upon the ground of mutual mistake in describing the property; and for the can-

cellation of a certain quitclaim deed made subsequent to the execution of the deed sought to be reformed, and to divest defendant Gregg of title to two strips of ground and vest title in plaintiff.

A general outline of what was done may best precede the statement of the particular attending circumstances, which govern in the determination of the case. As the case was brought and as between plaintiff and the defendant Gregg, there was immediately involved ownership of two strips of ground approximately five feet in width, parts of the west half of Lot 3 in Home Heights Subdivision, St. Louis County; but as the case stands upon appeal, the issue is as to only one of those strips. The north line of said Lot 3 of Home Heights Subdivision fronts on St. Louis Avenue. Lot 3 contains 6.88 acres. At the time of the beginning of the transactions forming the subject of this suit, said Lot 3 was owned by two men. One Kuhn owned what was spoken of as the east half of the lot, and the defendant Brewer owned what was spoken of as the west half of said lot. The west (Brewer's) half contained 3.50 acres, and the east half 3.38 acres. Kuhn is not a party to this suit, but the west line of his land, as fenced and occupied by him, enters into the acts of the parties in locating parts of the west half of the lot (Brewer's property), described in the deeds sought to be reformed. Kuhn's fence was on, or within, a few inches of the north-and-south center line. The north line of Brewer's property extended along the south line of St. Louis Avenue from Kuhn's northwest corner westward 255 feet and some inches. It extended south from the south line of St. Louis Avenue 575 feet, or 600 feet south from the center of said Avenue. Brewer's residence fronted on St. Louis Avenue, and his residence and outbuildings were situated on what, for convenience, may be spoken of as the northeast quarter of his property.

On August 9, 1919, Brewer agreed to sell and convey to plaintiff Kidd all of the west half of said Lot 3, except 125 feet in width of the northeast part. At that time he gave Kidd an earnest-money receipt, the property being described as all of the west half of said Lot 2, "except the east 125 feet fronting on St. Louis Avenue of said lot, with the improvements thereon, and extending south to within three feet of rear of barn thereon, or 300 feet north of the south line" (of said Lot 3). The part excepted and to be retained by Brewer was to have a frontage on St. Louis Avenue of 125 feet, beginning from Brewer's east line, or, the line between the property of Brewer and the property of Kuhn. The evidence, oral and written, makes that clear. All of the remainder of the west half of Lot 3 was to be conveyed to Kidd. Brewer and Kidd did not know the exact width of Brewer's property. Brewer and plaintiff's son took a tape line, started at Brewer's northeast corner, Kuhn's northwest corner, and measured off 125 feet west. They set stakes to mark the points. But, in the warranty deed from

Brewer to Kidd, executed August 20, 1919, description in said deed was given upon the theory that the west half of Lot 3 extended east and west 250 feet, instead of approximately 255 feet. The deed did not describe the property by saying it was all of the west half of Lot 3, except a tract or part thereof, whose north boundary line ran 125 feet west from the northeast corner of Brewer's property, as was intended by Brewer and Kidd; but, the deed undertook to describe the property to be conveyed, by metes and bounds, and it took the northwest corner of Lot 3 as a beginning point, and proceeded upon the erroneous theory that the west line of the property to be excluded was distant 125 feet east from the west line of Lot 3, when in fact it was distant approximately 130 feet.

Under the description the deed failed to convey to Kidd a strip five feet in width along the west side of the land to be excepted, and failed to convey a strip five feet in width along and upon the east side of the west half of Lot 3, south of the property to be excepted. Thus, unknown to Brewer and Kidd, it left to Brewer a tract, or lot, approximately 130 feet in width from east to west, instead of 125 feet from east to west, fronting on St. Louis Avenue, and it also left standing in Brewer a strip of ground approximately five feet in width from east to west, extending from the south line of Lot 3, to the south line of the ground retained by Brewer.

In 1920, defendant Gregg bought from Brewer the property retained, or intended to be retained, by Brewer, and on September 7, 1920, Brewer and wife executed to defendant Gregg a warranty deed. The testimony tending to show what Brewer and Gregg intended will be referred to later. This deed to Gregg was so drawn as also to fix the northwest corner of the property of Brewer, the retained part to be conveyed, as being 125 feet east of the west line of Lot 3. Thus, as described in the deed from Brewer to Gregg, the north line was made to run from a point 125 feet east of the west line of Lot 3, "and thence, east, 125 feet and four and one-half inches, more or less, to the north-and-south center line of said Lot 3." The call of 125 feet and four and one-half inches did not reach the center line, Brewer's line, by nearly five feet. On July 22, 1922, defendant Gregg caused the ground to be surveyed, and discovered that there was a strip of ground, approximately five feet wide, running from north to south on and along the entire east side of the west half of Lot 3, which the deeds made by Brewer did not cover. Immediately after Gregg learned that this strip had not been conveyed by Brewer, he induced Brewer to made a conveyance to him of this strip of ground. Brewer gave him a quitclaim deed, dated July 25, 1922. Therein the strip was described by metes and bounds as follows: "Beginning in the south line of St. Louis Avenue 250 feet four and one-half inches, more or less, east of the west line of said Lot 3, thence east-

wardly four feet nine inches, more or less, to a point; thence south-
wardly 575 feet, more or less, to the southern line of Lot 3; thence
westwardly four feet nine inches, more or less, to a point 250 feet,
four and one-half inches, more or less, east of the west line of said
Lot 3; thence northwardly and parallel with the west line of said
Lot 3, 575 feet, more or less, to the south line of St. Louis Avenue,
the point of beginning.'' Gregg paid Brewer $25 for "his trouble.''
The trial court found that the quitclaim from Brewer to Gregg was
ineffective, as a conveyance of the south end of the strip, and found
for plaintiff, as to all that part of the strip lying south of the south
line of the lot reserved by Brewer, and conveyed by him to Gregg.
Gregg did not appeal. The court found for defendant Gregg as to the
strip of five feet upon and along the west side of the lot of Gregg, as
bounded in Brewer's deed to Gregg; and Kidd appealed.

Kidd's appeal is taken, because, in reforming the deed from Brewer
to Kidd so far as to give Kidd the south end of the five-foot strip,
which meant a holding that Brewer intended to exclude and to retain
only 125 feet fronting on St. Louis Avenue, the court did not go
farther, and so reform Brewer's deed to Gregg, as to leave Gregg
125 feet fronting on St. Louis Avenue, running west from the Kuhn
line, with a depth of 275 feet, and thereby also give to Kidd the strip
of five feet upon and along the west part of the lot of Gregg, as that
lot was described in Brewer's warranty deed to Gregg. On the other
hand, counsel for Gregg argues that the mistake in the deed from
Brewer to Kidd, was not a mutual mistake; that the scrivener, in
drawing that deed, acted for Kidd alone.

The trial court found there was a mutual mistake in the description
in that deed; and its finding is abundantly supported by the evidence,
both written and oral, which showed beyond controversy that Brewer
was selling and Kidd was buying all of the west half of Lot 3, except
the northeast part, extending 125 feet west from Brewer's east line,
and extending south to a line 300 feet north of the south line of
Lot 3. The evidence does not show that the party who drew the deed
was employed by or acted for Kidd alone. The testimony does not
show what particular person prepared the deed, but a careful read-
ing of the testimony of Brewer, and of Kidd, leads to the conclusion
that one had as much to do with the matter as the other. They under-
stood what was to be excepted, in fact, but they erred in the matter
of its description. When they met to close the sale at Wetzel's office,
they found the deed already prepared. The testimony tends to show
that each of them read the deed, and they supposed it correctly de-
scribed the property to be conveyed—the west half of Lot 3—except
that part of it which they had marked off; and they continued in
that belief until the property was caused to be surveyed by Gregg,
two years later. The mistake they made was not unilateral, but was

mutual; and, as between Brewer and Kidd, the latter was entitled to have the deed reformed to conform to their agreement. [Dougherty v. Dougherty, 204 Mo. 228; Maze v. Boehm, 281 Mo. 507; Kanan v. Hogan, 270 S. W. 646.] Kidd was entitled to this reformation completely, unless, in respect of a part—the five-foot strip—a counter equity in Gregg as a purchaser for value and without notice of Kidd's right, prevented the reformation as to that part. Not without weight, also, is the fact that Gregg did not appeal from the judgment against him, carrying reformation of the deed, so far as to give to plaintiff the five-foot strip on the east side of the south end of the west half of Lot 3, a judgment which inevitably was based upon the finding there was a mutual mistake made in the deed to plaintiff. [Schmidt v. Densmore, 42 Mo. 237; People's Railway v. Grand Ave. Railway, 149 Mo. 245; Scott v. Ferguson, 235 Mo. 576.] The court held for plaintiff as to the five-foot strip off of the south end, on the further theory, of course, that the quitclaim deed from Brewer to Gregg conveyed nothing at all, or, at least, that the deed was taken by Gregg with notice of the facts; and, that as to that strip, and as against Kidd, Gregg stood in no better position than did Brewer himself. The court found for Gregg as to the other five-foot strip, the west five feet of the lot described by metes and bounds in the warranty deed from Brewer to Gregg, omitted by the description in the deed from Brewer to Kidd, upon the theory that under the facts Gregg was a purchaser for value without notice of Brewer's rights. The complaint of plaintiff is that the court did not proceed to the full conclusion logically following the facts shown in the evidence, or, the facts found by the court. It is manifest that the court's final disposition was based upon a distinction arising out of the difference between what Gregg knew when he took the warranty deed, and what he knew when he took the quitclaim deed. A reference to that subject is appropriate at this time.

In August, 1919, when Brewer and Kidd made their contract, Kuhn had a fence on or within a few inches of the line between him and Brewer, which had been there since at least as far back as 1910. Brewer, and Kidd's son, who was acting for him at the time, measured with a tape-line, along the north line of the lot Brewer was excepting. They measured off 125 feet, west, starting from Brewer's northeast corner, or Kuhn's northwest corner. They also measured 275 feet as the depth of the lot, toward the south, from the south line of St. Louis Avenue. At that time they set some wooden stakes to mark the corners, the northwest and the southwest corners of the land measured, and to be retained by Brewer. Soon afterward, Kidd set some iron stakes, pieces of gas pipe, in place of the wooden stakes. It is shown by the testimony that at the time, there was a privet hedge running along the north side of the lot measured off. It extended

from Kuhn's corner westward more than 125 feet, that is, four or five feet beyond the west line of the part to be excepted. The iron peg, placed by Kidd to mark the northwest corner of the excepted land, was in or very near this hedge, In August, 1920, when Brewer and Gregg made their contract, they did not do any surveying or measuring. It is clear from their testimony, and indeed from the testimony of Gregg himself, that what Brewer was selling and Gregg was buying, was the lot containing the improvements, a lot whose north line extended west 125 feet from the Kuhn line, with a depth of 275 feet from the south line of St. Louis Avenue. Gregg testified that he so understood it. As to the notice which Gregg had of the actual location of the west end of the north line of the property, the testimony is not wholly clear. Brewer testified that he did not point out to Gregg any stakes or corners, and Gregg testified to the same effect; and, that he did not see the iron stakes or marks which Kidd had placed, one at the northwest corner, at or near the privet hedge, and the other at the southwest corner of the lot under consideration. Gregg testified that he saw the privet hedge extending westward from Kuhn's fence, and he supposed the north line of the lot he was buying extended the length of this hedge. The court's judgment evidently was upon the theory that when Gregg purchased, in August or September, 1920, the deed from Brewer to Kidd, according to the exact boundaries fixed in that deed, excluded the lot conveyed to Gregg; and, there was nothing of record to show that Kidd had any claim to it, or to any part of it. The judgment of the court is further based upon the theory, and finding, that the testimony as to facts outside the record failed to show notice to Gregg, at the time of his purchase, that Kidd was claiming or could claim any land fronting on St. Louis Avenue, and extending east beyond the line fixed in his deed. The judgment thus was upon the theory that as to the west five feet, included in the description in the warranty deed from Brewer to Gregg, the latter was a purchaser for value and without notice. That prior to Gregg's purchase in 1920, Kidd had the right to have his deed from Brewer reformed so as to carry out the intention of the parties to that deed and make the deed a conveyance to the boundary line as understood by them at the time of the sale in 1919, cannot be doubted. [Henderson v. Beasley, 137 Mo. 199.] It is also well settled that the remedy will not only be granted against the original parties, but also against those claiming under them in privity, such as personal representatives, heirs, assigns, grantees, judgment creditors or purchasers with notice of the facts. [Sicher v. Rambousek, 193 Mo. 129. See also annotation, 44 A. L. R. 78.] A further rule is stated in Sicher v. Rambousek, supra: "One who has notice of a fact which ought to have put him on inquiry, and which he might have dis-

covered by using due diligence, cannot claim as a purchaser without notice.''

The debatable issue·in this case is as to the five-foot strip, the west five feet of the lot described in the warranty deed from Brewer to Gregg; and, as to that, the question is one of notice to Gregg, at the time of his purchase, of facts which ought to have put him on inquiry, whereby in the exercise of due diligence he would have discovered the true situation. The allegations of plaintiff's petition proceed upon the theory and statement, that Brewer and Gregg agreed and understood that the former was selling to the latter, a tract fronting 125 feet on St. Louis Avenue, and extending south 275 feet from St. Louis Avenue, and having for its eastern boundary line the line between Brewer and Kuhn. The plaintiff alleges that neither Brewer nor Gregg knew, or intended, at the time, that the deed Brewer made to Gregg covered, or was intended to cover the west five feet of ground included in the description given in that deed, and plaintiff also alleges the making by Brewer and Gregg of a mutual mistake, in that regard. But the petition, after alleging the agreement as actually made and understood by Brewer and Gregg, further charges that Brewer and Gregg had full knowledge of the agreement and understanding between Brewer and plaintiff, Kidd; and, that possessing such knowledge, and contrary to the agreement between Brewer and Kidd, the deed of Brewer to Gregg was made and taken. The answer to Gregg is a general denial; but, by his petition, the plaintiff assumed the burden of showing that Gregg, with notice, took a deed covering the five-foot strip in dispute, which Brewer had theretofore sold and had intended to convey, but had not conveyed, to Kidd.

As has been stated, when Gregg dealt with Brewer, one year after Brewer made the deed to Kidd, Gregg understood he was buying the lot containing the improvements, and that this lot began at Kuhn's fence and extended thence west 125 feet. Gregg says he saw the privet hedge along the front of the lot, extending west from the northeast corner, and he supposed the lot he was buying extended as far west as the west end of the hedge. There was no testimony or claim that Brewer made any statement to Gregg that the lot extended to the west end of the privet hedge. At the time.of Gregg's purchase, Brewer lived on the property and he lived there for about one month after the sale to Gregg. The latter did not move upon the property until about two years after the purchase and until after he had the survey made, and had erected a fence along the west boundary, as that boundary was fixed, by his deed, and located by the surveyor, according to the description in the deed. No dispute about the boundary line arose between Gregg and Kidd until after the survey, and the beginning of the erection of the fence. When the survey was made, and the lines as fixed by the deeds were explained to Gregg,

he told Brewer that he, Brewer, still had five feet along the east side of the west half of Lot 3. Brewer did not think so. Gregg convinced him that this was the fact, under the descriptions in the deeds, and wanted Brewer to make him a deed to that strip. Brewer agreed to make a quitclaim deed, provided Kuhn and Kidd had no objections thereto. Gregg got Kuhn and Kidd together, and made some explanation of the matter. Kidd, at the time, said nothing. Kidd, clearly, would not be concerned with five-foot strip upon the east side of Gregg's lot. Kidd had preserved the earnest-money receipt given to him by Brewer, but he did not show this receipt, which correctly described the land he had purchased from Brewer, until after the quitclaim deed was made. It is apparent that Kidd did not immediately realize how he might be affected. He was claiming, and apparently occupying, the land up to within one to two feet of the line north and south between the stakes. Brewer testified that these stakes stood two or three feet above the ground, and were very conspicuous. Elbring, the surveyor, who found them in making his survey, said they stood about six inches above the ground. He said the one at the southwest corner was conspicuous, and the one at the northwest corner near the privet hedge was not so readily visible as the other. At the time Brewer sold to Kidd, there was a line of cherry trees standing on the west part of the land Brewer was excepting. Brewer sold to Kidd, and located the west line of the land he was excepting, so as to include the cherry trees in the part excepted by him. Gregg said he saw the cherry trees, and knew they were located on the land he was buying from Brewer, but that he did not know how far west the west line of the lot was from the cherry trees. Brewer testified that these cherry trees were about eighteen inches east of the west line—that is, the north-and-south line distant 125 feet from Kuhn's line. After Kidd got his deed from Brewer in August, 1919, he went into possession. Trusten P. Kidd, son of plaintiff, who helped Brewer measure off the 125 feet, testified that after the deed was made to his father, the property was "cultivated from year to year." Asked how far eastward it was cultivated, he said: "Well, within—say two feet of the line—the west line of what Mr. Brewer had reserved," or, as he said: "Within two feet of the line drawn between the iron posts."

It is to be borne in mind that Kidd's possession antedated Gregg's purchase, by about one year. Gregg was asked as to the cultivation by Kidd, along or near the line between Kidd and the land excepted by Brewer, and later sold to Gregg, and as to cultivation with reference to the line of cherry trees. Gregg, after the survey, put his fence on the west line as located by the surveyor under the description given in Brewer's warranty deed. Gregg said this fence was four or five feet west of the line of cherry trees. He was asked how near

to the line of cherry trees Kidd's cultivation came. He answered: *"I would say, within a foot or a foot and a half."* Immediately following that answer appeared the following:

"Q. His cultivation went up to within about a foot of the cherry trees? That is, a foot west of the cherry trees, would you say? A. No, no; I would say a foot or a foot and a half from the fence, east of the fence.

"Q. East of the fence? A. Yes, sir.

"Q. How far west of the cherry trees? A. I would say about two or three feet.

"Q. There was no fence up there at all, when—A. Not when I purchased it.

"Q. Was there any other line of demarcation that you saw visible there, other than the cultivation? A. None that you could see—that you could swear to.

"Q. Was there any other line of demarcation there that you saw or that could be seen? A. Only the plowed ground, that is all.

"Q. The plowed ground? A. Yes, sir.

"Q. Was there any garden in there? A. I guess he got stuff that was growing there, from time to time; I never paid any attention to that.

"MR. DYER: Q. How is that? A. I said I saw some stuff growing there; I presume he had some stuff growing there from time to time; I never paid any attention to that."

Connected with this, and preliminary to setting forth some further portions of Gregg's testimony, it is best to mention certain other circumstances preceding and attending his purchase of the lot from Brewer. In the summer of 1920, Gregg looked at the property with a view to its purchase for one John James, who was one of his employees and also a relative. James accompanied Gregg in looking at the property. It appears that Gregg was, at the time, indebted to James. As a result of this investigation, Gregg made a contract with Brewer for its purchase by James, and on behalf of James paid Brewer $100, and took from Brewer an earnest-money receipt, in the name of James. This receipt was not produced. There is no testimony to show how the property was described therein. James left the State and did not go forward to complete the purchase of the property. Gregg then went to Brewer with the purpose of buying the property himself, and of substituting himself for James under said contract. Brewer agreed, and the warranty deed was made. Gregg was asked what Brewer pointed out to him in these negotiations, and said ▸ *"Brewer* never pointed out any 125 feet." Immediately following that he testified:

"Q. Mr. Brewer never pointed out any line—A. No, just 125 feet.

317 Mo. Sup.—67.

"Q. Didn't point out any line of cherry trees? A. No, I don't think—

"Q. A line of cherry trees on the west there? Is there one there? A. Yes.

"Q. That line of cherry trees was never pointed out to you? A. No, not exactly.

"Q. *Not exactly? A. In staking it off, I think that was to be where the line was; in fact, I thought in purchasing the property I was getting my money's worth; I didn't care to quibble over one or two feet; I thought I was getting what was right.*

"Q. And you had an idea that the west line there took in those cherry trees, did you not? A. I had that idea, yes.

"Q. Did Mr. Brewer say anything to you with reference to the west line taking in those cherry trees? A. I think he did; I know he has since.

"Q. Well, did he say anything about the time you made the purchase, or before? A. I don't remember; no, I don't remember; he may have and may not have.

"Q. You don't remember his showing you any iron pegs there on the west line, and telling you that—A. No.

"Q. Will you say he did or did not? A. I will say that he did not.

"Q. That he did not? A. No, sir.

"Q. And he never pointed out directly to you, in any way, where your west line would come? A. No.

"Q. But you did understand that it came just outside—that is to say, just west of those cherry trees? A. I understood it was somewhere west of the cherry trees.

"Q. But how far west you didn't know? A. No.

"Q. Did you ever see two iron posts there, one toward St. Louis Avenue and one back toward what would be approximately your southwest corner? A. My southwest corner?

"Q. Yes. A. At the back end of the place?

"Q. Yes; one back at the southwest corner of your place and another back at where the fence came at the northwest corner? A. If it has been put there, it is since this fence has been put up.

"Q. Since this fence has been put up? A. Yes, not prior.

"Q. I understand, but did you see those pegs there? A. I guess I did, since.

"Q. You have seen them? You know they are there? A. If they are there, I have seen them; but I can't say that; no.

"Q. You don't know whether they are there or not? A. No, I do not.

"Q. Didn't the surveyor bring these two iron pegs to your attention—or did he? A. He may have brought them to my atten-

tion or may not; I don't remember, because I had a workman there at the time, and I told the workman to keep inside of certain pegs, that that was my property; it was my fence, and I was putting it up.

"Q. You don't recollect, though, whether—who surveyed the property, by the way? A. Elbring.

"Q. You don't recollect whether he brought these iron pegs to your attention in any way? A. I do not.

"Q. He may have done so or not? A. I had him put down wooden posts for this man, so he couldn't deviate from that line. Now, as to the iron pegs, I couldn't say. He put down wooden pegs; I presume he did put them there, and that I saw them. I can't say that I saw them, to be accurate about that.

"Q. What, if anything, did Mr. Brewer say to you with reference to your side line? A. Two hundred and fifty-seven feet or three hundred feet from the center of St. Louis Avenue.

"Q. Did he mark out that lot and show you where it came to in any way? A. No, because there was a fence there.

"Q. There was a fence there? A. Yes, sir.

"Q. But he indicated to you that your south line came to that fence? A. Yes.

"Q. Did he indicate in any way to you where your east line would be? A. No."

The foregoing was given by Gregg in a deposition. In his direct examination upon the trial he told of having the survey made, and the following appeared: "Q. After you got this survey, what did you find? A. I found I stood further—*a little further than I thought I stood over*." In his cross-examination he said when he bought, he supposed as a matter of fact that the 125 feet he was buying was immediately contiguous to Kuhn, and that his deed called for that property.

The testimony of Mr. Gregg as heretofore set out, illustrates his evasiveness concerning any admission that the iron pegs or gas pipes were set at the northwest and southwest corners. He is equally evasive on other subjects. He said he could not remember that Elbring, the surveyor, brought those iron pegs to his attention. Elbring testified that when Gregg procured him to make the survey he expressed himself as wanting to "know where his line was by his deed, and wanted his lot surveyed according to his deed." Elbring testified that he showed the iron stakes to Gregg, called his attention to them, and explained the discrepancies in the deeds, and he described the stake at the southwest corner as "very conspicuous." Gregg lost no time in procuring the quitclaim, and in putting up the fence. The question before us is one of notice to Gregg at the time he purchased the property in 1920, of facts as to the true line, facts to put him then upon inquiry.

It is true, as urged by counsel for Gregg, that in an equity case, the finding of a chancellor on conflicting evidence ordinarily is not to be disturbed upon appeal. [Tinker v. Kier, 195 Mo. 183; Huffman v. Huffman, 217 Mo. 182; Vaughn v. Vaughn, 251 Mo. 441.] Where the determination of the issue depends upon oral testimony, the findings of the chancellor, even though slightly against the weight of the evidence, will not be disturbed on appeal, except for plain error. "Where an issue in equity rests alone on the credibility of the witnesses, the upper court may, within entire propriety, rest somewhat on the superior advantage of the lower court in determining the fact." [Creamer v. Bivert, 214 Mo. l. c. 480.] To authorize the grant of relief in cases of the character of the instant case the proof should be clear and convincing.

We have reached the conclusion from Mr. Gregg's own testimony taken with the circumstances clearly shown in evidence, that when he took his warranty deed, he took it with notice of such facts, as followed up by due inquiry, would have apprized him of the rights of Kidd.

According to Gregg, Brewer indicated the south line of the property as being where the fence was. The fence was something readily, indeed unavoidably, to be seen. Yet, although there was no fence along the west line next to Kidd, Gregg denies that anything was pointed out to him to indicate the west line, or that anything was visible to show where the west line would be, except that he says he thought the privet hedge extended 125 feet, and except, also, he appears to have seen the cultivation by Kidd eastward to a line which must have been east of the west end of the privet hedge. He says the line of cherry trees was never pointed out to him, or, as he put it, "No, not exactly." The cherry tree is a tree popularly associated with entirely frank disclosure of facts. Gregg says that in buying the property he thought he was getting his "money's worth," and he "did not care to quibble over one or two feet." But, when the surveyor located his west line as fixed by the description in the deed, he says he found he stood farther—"a little farther than he thought he stood over." He immediately secured from Brewer the quitclaim deed to the five-foot strip along the entire east side of the west half of Lot 3, covering not only the five-foot strip to which he was entitled under his purchase from Brewer, and of which he had been in possession since his purchase, but also the five feet south of that, south of the fence, which had been all the time in possession of Kidd, and he did this after the explanation by the surveyor, and although Brewer was disclaiming ownership.

Actually, we are dealing with what Gregg knew, or must have known, when he bought the property. We mention these transactions had long after, and after Gregg had notice of what the surveyor had

told him, and what Brewer had told him, and of Kidd's cultivation of ground, somewhat incidentally; yet, they have a connection with what Gregg says he thought. Brewer did not demand anything as a consideration for executing the quitclaim deed; but Gregg gratuitously gave him a check for $25, which Brewer accepted. Brewer did not remember pointing out any lines or monuments when Gregg looked at the property with a view to its purchase. He says nothing about indicating to Gregg that the fence showed the south line of the lot. We defer somewhat to the findings of the lower court, but in a case of this character, we are not bound by them, and may make our own findings. We cannot concur in the finding of the trial court that defendant Gregg was a purchaser of the five-foot strip intended to be included in the deed to Kidd, and lying immediately west of the 125 feet bought by Gregg and intended to be conveyed to him, without notice. Despite Mr. Gregg's denials, he admitted enough, when considered with all the circumstances and facts shown in evidence, beyond doubt, to drive us to the conclusion that when he bought the 125 feet, he knew his west boundary line did not lap over the land of Kidd to the line now claimed by him. When he says he found he stood over farther than he thought he did, he settled that question. In these transactions Kidd bought and paid for all of the west half of Lot 3, except 125 feet of the north part extending from the Kuhn line. Gregg bought and paid for only the 125 feet extending west from the Kuhn line. All the persons concerned in the land involved in this suit, were made parties, including the holder of the mortgage made by Gregg. Under the facts, Kidd is entitled to have his deed reformed according to the agreement between him and Brewer; and Gregg was and is entitled to have his warranty deed from Brewer reformed according to their agreement, and according to the survey.

The judgment is reversed and the cause remanded with the directions that this be done. *Seddon* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by Lindsay, C., is adopted as the opinion of the court. All of the judges concur.