# OCTOBER, 1937.

ALBERT ANDRIS, PLAINTIFF, RESPONDENT, v. JUANITA ANDRIS, DEFENDANT, APPELLANT.—109 S. W. (2d) 707.

St. Louis Court of Appeals. Opinion filed Nov. 2, 1937.

*Rendlen, White & Rendlen* for appellant.

*Berryman Henwood* and *Hulse & Hulse* for respondent.

BENNICK, C.—In this action the plaintiff, Albert Andris, a resident of Hannibal, Missouri, seeks a divorce from his wife, Juanita Andris, and from a decree of the Hannibal Court of Common Pleas awarding him a divorce as prayed, the defendant's appeal to this court has been perfected in the usual course.

Plaintiff lacked but one month of being sixty-four years of age at the time of his marriage to defendant, which occurred on May 21, 1932. He had been married twice before, the first time in 1896, and the second time in 1906. The first marriage endured for a little over a year, and then ended in a divorce which plaintiff obtained from his wife in the courts of Hannibal. The second marriage was terminated by the death of the wife, which occurred in November, 1930.

Plaintiff's only child is a daughter by his first marriage, who is referred to in the evidence as Anna Watson. She is now about thirty-nine years of age, is married, and also resides in Hannibal.

Plaintiff is a carpenter by trade, and has followed his calling, rather successfully it would seem, from the time he was only thirteen or fourteen years of age. As a result of his labors he has accumulated considerable property in Hannibal, consisting of a brick house on Lyon Street, including two garages with rental accommodations for nineteen automobiles; a two-story brick house and a one-story brick house, both situated upon a tract of land two blocks square on Grand Avenue; a carpenter shop on Market Street; and a half interest in a double house, with four rooms to the side, on South Seventh Street. So far as the value of his real estate holdings is concerned, plaintiff estimated that he had invested from $10,000 to $15,000 in the Lyon Street property; he at one time asked $25,000 for his Grand Avenue property; he put the value of the Market Street property at from $1500 to $2000; and he stated that the two houses on South Seventh Street were worth $3000 each in normal times. In addition to this, he testified to his ownership of a note for $1000; 30 shares of stock in Price Theatres, Incorporated, of Hannibal, upon which he had been steadily getting dividends; and some stock of an undetermined value in the Hannibal Trust Company.

Defendant was about thirty years of age at the time of her marriage to plaintiff, and had been married thrice before, once to a man named Walker, and twice to a man named Miller, by whom she had a daughter, Palmeta, who is now about thirteen years of age. Each of defendant's prior marriages had terminated in a divorce obtained in her favor.

Defendant's father is one Frank Glascock, a railroad switchman, with whom plaintiff had been acquainted since they were "boys together." He had of course known defendant all of her life, but because of the great disparity in their ages had had no personal contacts with her until along in 1931 or thereabouts when she began renting garage space from him at his Lyon Street property.

Defendant was the operator of a beauty parlor located at the time on Market Street opposite plaintiff's carpenter shop, and because of municipal parking regulations found it convenient to rent space in one of plaintiff's garages which was located in the rear of his home, only a block or so distant from her place of work. In going to and from the garage defendant would frequently find plaintiff occupied in and about his yard, and in their casual conversations together while he would be assisting her with the doors of the garage he took occasion to complain to her of his loneliness and unhappiness. Then came occasional automobile rides together, followed shortly by plaintiff. becoming a more or less frequent visitor at defendant's beauty parlor, with this in turn soon ripening into a courtship to which each party now disclaims the honor of having been the moving spirit, but with the record showing that the marriage license was obtained by plaintiff, whether at defendant's insistence or not, on April 27, 1932, although the marriage was not performed for almost a month thereafter, or until May 21, 1932.

All through the case runs the question stressed by plaintiff of whether defendant married him purely for mercenary motives, and not because of any love or affection for him or interest in his happiness and welfare. Whatever her motives may have been, she unquestionably knew that plaintiff was a man of property, and during the period of the courtship would appear to have made some inquiries at least regarding the extent of his holdings.

The fact is, however, that so far as displaying an interest in subsequent property rights was concerned, plaintiff seems to have given a great deal of attention to the matter on his own part. He admitted that he not only desired to have a marriage contract executed before the marriage, but told defendant that he would not marry her unless she would sign such a contract. He selected his own attorney for the preparation of the instrument, and a week or so before the marriage went alone to the attorney's office and had a contract prepared conforming to his own wishes in the matter, the purport of which was to provide that in the event that defendant should survive him as his widow, then, in lieu of dower, homestead rights, and the like, she should receive a life estate in the Grand Avenue and Market Street properties, and should be paid the sum of $500 in cash out of his estate.

Later plaintiff took defendant with him to his attorney's office where the contract was read to both of them, and after its execution without any objection on defendant's part, duplicate copies were handed over to plaintiff, who took them to his home and placed them in a lock box which he kept in the sideboard and to which he alone had the key. Some months later, when plaintiff had occasion to go to the box on another matter, he found that it had meanwhile been tampered with and that the key to the box was missing off his key

ring. He thereupon unsoldered the lock, and upon opening the box discovered that the two copies of the contract were not among its contents. He then had additional copies prepared from his attorney's file copy and placed these in the unlocked box. Shortly afterwards he had occasion to go to the box again, and found that the additional copies of the contract were likewise missing.

Plaintiff charges defendant with responsibility for the disappearance of the contracts, though he suggests no actual basis for his suspicion other than the fact that she knew that they were in the box and might stand to profit. by their disappearance, together with the further fact that a few days before his discovery that the box had been opened defendant had brought his keys to him at the neighborhood fire engine house where he and certain of his cronies were accustomed to loaf during the daytime. In fairness to her it should be stated, however, that she delivered the keys to him openly and without any pretense at concealment, her own testimony in explanation of how she happened to take them to him being that "Mr. Andris had a habit of leaving his keys any place. He would lock the garage door and leave them hanging in the door. I found them laying there one day, they were in the door, and I never thought anything about it, and I went to the fire department and said, 'Pappy, here is your keys you left in the garage.'"

Who other than defendant could have had a possible motive for doing away with the contracts or otherwise creating a disturbing situation about the house is left only to surmise and conjecture. It does appear from the evidence that all was not well between plaintiff and his daughter; that she had never visited at his home at any time during the period of his second marriage; and that while she called to see him twice during the period of ten months that he and defendant were living together, it was always at a time when defendant was away from home. As to this he testified that "she wouldn't come when my wife and I were there." There were also a couple of occasions when plaintiff and defendant returned home and found that the house had been entered by some one in their absence and the dresser drawers and the like rifled of their contents. His testimony was that no one but he and defendant had keys to the house, but irrespective of whether any one else was known to have a key or not, or whether any one else may have so resented defendant's presence in the house as to have wished to cause. her unhappiness, the fact remains that but little reason exists for pointing the finger of suspicion at defendant herself, at least in the matter of the entry into the house and the disarrangement of its contents.

It was around the first of December, 1932, or about the time of plaintiff's discovery that his lock box had been opened and the copies of the marriage contract abstracted from it, that serious difficulties began to develop between him and defendant. Up until that

time, or for the first five or six months of the marriage, he makes no particular complaint about defendant's conduct or attitude toward him. However from that time on their lives were filled with constant bickerings and wranglings, and finally, on March 25, 1933, defendant left plaintiff and returned to her parents' home, where, in fact, she had already spent considerable of her time after the first of the year during protracted periods of severe illness to which she had been subjected.

In his petition, which was filed on June 17, 1933, plaintiff alleged that throughout the marital period he had faithfully demeaned himself as the husband of defendant and had treated her with kindness and affection at all times, but that he believed, just as defendant herself was alleged to have told various persons, that she did not marry him because of any love or affection for him, or any interest in his happiness or welfare, but only for the purpose of getting possession of his property.

He then alleged the execution of the antenuptial contract and its subsequent disappearance from his lock box, and that from and after the time of his discovery of its disappearance defendant began to neglect her duties to him and their home and to display an attitude of viciousness toward him.

Then followed the charge that throughout said period she absented herself from him and their home almost every day in the afternoon and evening until the late hours of the night; that she failed and refused to keep the home clean and in order, and on numerous occasions failed and refused to prepare meals for him or to wash the dishes used by him; that she cursed and abused him, and addressed him with profane and obscure language, and applied vile names and epithets to him; that on several occasions she exhibited a spirit of anger and bitterness toward him in the presence of visitors in their home by slamming doors and by addressing him in an ugly and unbecoming manner; that on other occasions when he entered the home he found the outside doors unlocked, and clothing and other articles removed from dresser drawers and scattered over the floor, all of which he believed was done by defendant for the purpose of tormenting him; and that on one occasion defendant accused him of stealing money from her, and on the same day accused him of stealing everything he possessed, although she knew there was no foundation in truth for such an accusation.

Finally he alleged that defendant had subjected him to all of said indignities without cause or provocation on his part, and by said indignities had rendered his condition in life intolerable, in consequence of which he prayed that the bonds of matrimony contracted between him and defendant be dissolved, and that he be granted a decree of divorce.

Defendant's answer, following an admission of the fact of the

marriage, was a general denial of each and every other allegation contained in the petition.

A trial was had upon the issues joined, resulting, as we have already indicated, in the entry of a decree in plaintiff's favor; and now the case is before us on defendant's appeal, with the point made and strenuously insisted upon that plaintiff did not prove himself to be an innocent and injured party, and that his petition should consequently have been dismissed.

So far as concerns the question of whether plaintiff proved himself to be an injured party, if there were nothing more to the case than this the rule of due deference, when applied to the controverted evidence adduced, would undoubtedly warrant us in concluding with the lower court that defendant was at fault in her relations with plaintiff, though not in all the respects and to the full measure charged against her in the petition.

As has already been suggested, the point most stressed by plaintiff throughout the case is that defendant married him purely for mercenary motives, and not because of any love or affection for him or interest in his happiness and welfare. As to this we have no doubt that defendant was prompted by mercenary motives to a greater or less extent in undertaking a marriage to plaintiff, but even so, it must be borne in mind that that fact in and of itself is no ground for divorce under our statute, and is of importance in the case only in so far as it may lend support to plaintiff's version of the controversial facts by disclosing a possible motive for postnuptial indignities allegedly heaped upon him by defendant. Indeed, plaintiff could hardly have expected that a young woman of defendant's age would marry a man so old as he from any spirit of mere romance, and if she was willing to become his wife, with all the responsibilities that such new relationship would entail upon her, then no great blame could have attached to her for having had some regard for her future financial security, provided only that it had nevertheless been her purpose and intent to be dutiful and faithful to plaintiff in conformance with the obligations which her marriage to him required that she assume.

So far as concerns the charge laid in the petition that defendant absented herself from home and refused and neglected to perform her household duties, we think that plaintiff could surely have had no great cause for complaint on that score. Her time away from home was spent at her beauty parlor, as even plaintiff's own evidence disclosed, and while there was some little attempt on plaintiff's part to show that he had requested her to give up the operation of her beauty parlor after her marriage to him, the significant fact is that he never made it possible for her to do so.

Not only was defendant forced to bear most of her own personal expenses after her marriage to plaintiff, but in addition she was faced

with the matter of the support and education of her little daughter, who was only eight years old, and had never received anything toward her maintenance from her father. Plaintiff gave no home to the little girl after his marriage to her mother, but she was left instead to reside with her grandparents, where defendant was compelled to go each day in order to accompany the child to school. She did have lunch each day with her mother, but in no other sense was she a member of the household, and if plaintiff had sincerely desired that defendant have no interests away from home, then in all fairness he should have seen to it that such outside interests were no longer necessary. It may well be true that defendant's housework suffered somewhat at the expense of her beauty parlor, but in view of the difficult and unusual situation with which she was confronted she seems to have done about as well as could have been expected of her under the circumstances.

Indeed there is still a further fact to be considered upon the question of defendant's neglect of her household duties, which is that during much of the period from December to March, of which it is that plaintiff chiefly complains, she was ill and under a doctor's care. As to the truth of this there is but little, if any, dispute in the record. From December 4th to December 28th she was laid up with an attack of influenza, and during the months of January and February she suffered first from an acute inflammation of the bladder, and then from a serious attack of ptomaine poisoning, the effects of which had not yet entirely left her at the time of the trial below. Indeed plaintiff himself paid the doctor's bills covering the treatment that his wife received, and it therefore came with very poor grace from him to complain as he did of defendant's failure to have washed windows, scrubbed floors, and the like over a given period when he knew that she had been ill and confined to her bed at extended intervals throughout that very time.

The credible evidence discloses that it was during the period from December to March that plaintiff began the practice of frequently playing cards at night with certain of his cronies, including one "Koozie" Franzman, a sort of odd-jobs man in the neighborhood, who seems to have spent a great part of his time on the premises. The kitchen was the principal scene of their activities, save that their drinking was done in the basement where plaintiff kept his supply of wine. Plaintiff's evidence was that their conduct on these occasions was quiet and orderly, while defendant's evidence was that all the men, including plaintiff, were loud and boisterous, with their language and general conduct commonly characterized by profanity and vulgarity of the vilest sort.

The charge that defendant exhibited a spirit of anger and bitterness toward plaintiff in the presence of visitors in the home by slamming doors and by addressing him in an ugly and unbecoming

manner is directed to the question of her attitude toward the presence in the house of these associates of plaintiff on three or four nights a week. Defendant admits that on one occasion in the latter part of March she did slam the door as an expression of her disgust at what she says was the vile and degrading conduct of the men in the kitchen, while plaintiff contends, of course, that she had no provocation or excuse for the outburst of ill temper she displayed.

But though there were the extenuating circumstances we have pointed out with respect to many of the specific charges lodged by plaintiff against defendant, there is still no escaping the conclusion that he did make out a strong case against her in support of his charge that she cursed and abused him, addressed him with profane and abusive language, and applied vile names and epithets to him, all inconsistent with any other conclusion than that she bore him no love or affection and had no genuine regard for his personal happiness or welfare. It is quite true that any and all of such conduct was emphatically denied by defendant and her witnesses, but in so far as the facts of the case are in dispute we are constrained to give due deference to the findings of the lower court, which are particularly persuasive in a case of this character where the ultimate result must depend so much upon the question of the credibility of the witnesses. So defendant, regardless of the fact that certain aspects of the case may react in a measure in her favor, is nevertheless to be adjudged a guilty party within the meaning of the law of divorce, which brings us then to the question of what is to be said about the due and proper discharge of plaintiff's own marital obligations toward defendant.

In other words, it is a fundamental principle of the law of divorce that before the complaining party is entitled to have a decree in his own favor, it is not enough for him merely to show that he was an injured party, but he must go forward with proof to show that he was also an innocent party as well. [Kistner v. Kistner (Mo. App.), 89 S. W. (2d) 106; Miles v. Miles (Mo. App.), 54 S. W. (2d) 741; Libbe v. Libbe, 157 Mo. App. 701, 138 S. W. 685; Schumacher v. Schumacher (Mo. App.), 14 S. W. (2d) 519; Ellebrecht v. Ellebrecht (Mo. App.), 243 S. W. 209; Coons v. Coons (Mo. App.), 236 S. W. 358.]

As one of his complaints, plaintiff testified: "I requested my wife to wash the windows and scrub the kitchen floor, and other floors. She did not do it. . . . There was no washing of windows or scrubbing of floors during the last five months." This complaint, moreover, despite the fact of plaintiff's wealth, and the undisputed fact that defendant was grievously ill during the greater part of the last five months prior to the separation.

As to the character of his own language toward his wife, plaintiff admitted: ".The most I ever said about her, I called her a liar. I don't know how many times I called her a liar, not very many. I didn't put any cuss words with it, when she told me a lie, I told

her she was a liar. . . . I didn't make no business of it. . . . I may have called her a pauper, maybe I did, she ain't got nothing.''

In the matter of his support of his wife, plaintiff testified: ''I gave her money to buy some clothes between the marriage and the separation, not very much, I don't know exactly. I sent her money twice up to her house, and I gave her money myself when I was up there. . . . I declined to pay for some clothes she bought and consulted Mr. Hulse about paying and he told me to go pay for it and I did. That bill was two or three dollars. It didn't amount to anything but I told her not to buy anything on credit. Whenever she wanted anything, I told her to ask for the money and I would give it to her. That two or three dollars was for some dresses. I gave her some money for Christmas and gave her money when she was sick. She said she was going to get clothing with the money I gave her. There may have been other occasions. She didn't bother me very much for clothes. She wasn't there long enough. When she asked for money for clothes, I gave it to her. I may have given her $20.00 or $30.00 at different times during the ten months we lived together for clothing and support. She didn't bring many clothes there at the time we were married. . . . She liked nice things.''

With reference to the habits of plaintiff and his cronies during their congregation in the kitchen on three or four nights a week, plaintiff testified: ''When these men were playing cards, I had spittoons around for them to use. We men folks would chew and spit. Mr. Franzman cleaned up the floor. . . . I used tobacco and chewed too and spit tobacco around there. I didn't ask my wife to clean that up. I told you that was what 'Koozie' cleaned up.''

Franzman, or ''Koozie'', who was called as a witness for plaintiff, testified: ''I understood she was running a beauty parlor . . . and I know she went there to attend to her business of evenings. That is the time when we men would gather in her house and kitchen, and smoke and chew tobacco and play cards. Had spittoons there in the kitchen where we would sit three or four hours at a time spitting, throwing tobacco, cigar and cigarette stubs. We had two spittoons there. . . . That went on three or four times a week there in the house. . . . She would come home from that work about ten or ten-thirty. We men would be draped around her kitchen in that fashion, playing cards, chewing and smoking tobacco.''

And not only did plaintiff and his associates litter up the kitchen in unseemly fashion as they themselves disclosed by their own admissions, but they extended their activities into the basement as well, where they would go to drink wine, and, in the absence of a convenient toilet, would make use of a screened drain pipe located

underneath the stairway leading down from the first floor. These were the men, incidentally, who were most critical of defendant's housekeeping, and from whose testimony in that regard we are asked to believe that her lack of cleanliness and orderliness in the home was so pronounced as to have entitled plaintiff to a divorce.

These few extracts from plaintiff's own evidence, which, as a matter of fact, have been taken in considerable part from his own testimony, reveal his true attitude toward defendant in clear and unmistakable fashion. We do not believe that one can read the record in this case without being thoroughly convinced that plaintiff, regardless of any shortcomings on the part of his wife, was himself arrogant and domineering toward defendant, niggardly and miserly in the matter of her support, unsympathetic toward her during her illness, inconsiderate of her rights and feelings, and lacking in the display of any sincere love or affection for her.

Of course we appreciate that plaintiff's own misconduct will not serve to prevent him from being entitled to the status of an innocent party as regards his right to a divorce unless it may be said that his misconduct was of such a nature as to have entitled defendant to a divorce if she had asked for such relief and had herself been an innocent party. [Rankin v. Rankin (Mo. App.), 17 S. W. (2d) 381; Jones v. Jones, 208 Mo. App. 632, 235 S. W. 481; Wehrenbrecht v. Wehrenbrecht, 200 Mo. App. 452, 207 S. W. 290; Tebbe v. Tebbe, 223 Mo. App. 1106, 21 S. W. (2d) 915.] However we think that under the facts of the case this rule of law avails plaintiff nothing. Were defendant asking for a divorce from plaintiff, and were she in a position to be held free from any personal blame for the marital difficulties in which the parties find themselves, could it be seriously argued, in the light of plaintiff's own admissions and the implications that unmistakably follow therefrom, that she was not an injured party within the meaning of the law?

In short, we cannot escape the conclusion that regardless of the undoubted basis there is in the case for believing that plaintiff was an injured party, he was nevertheless in no sense an innocent party, and with the record so disclosing, there is no recourse for us but to give effect to our own persuasion in the case, which is that plaintiff, upon the whole record, has not borne his burden of showing himself to be entitled to the relief he asks.

The Commissioner accordingly recommends that the judgment rendered by the Hannibal Court of Common Pleas be reversed and the cause remanded with directions that a new judgment be entered dismissing plaintiff's petition.

PER CURIAM:—The foregoing opinion of BENNICK, C., is adopted as the opinion of the court. The judgment of the Hannibal Court of Common Pleas is, accordingly, reversed and the cause remanded in

accordance with the recommendations of the Commissioner. *Becker* and *McCullen, JJ.*, concur; *Hostetter, P. J.*, dissents in separate opinion.

### DISSENTING OPINION.

HOSTETTER, P. J.—I regret my inability to concur in either the reasons employed, or the result reached, in the opinion in the instant case which was prepared by our Commissioner Bennick and adopted by my brother judges as the opinion of the court.

The majority opinion contains this erroneous and non-statutory rule in the following language, viz: "In other words, it is a fundamental principle of the law of divorce that before the complaining party is entitled to have a decree in his own favor, it is not enough for him merely to show that he was an injured party, but he must go forward with proof to show that he was also an *innocent* party as well," and citing cases only from Courts of Appeals.

Other portions of the opinion also contain language showing that the spouse seeking the divorce must show that he or she, as the case may be, is the "*innocent* and injured party."

Prior to March 12, 1849, the word "innocent" was contained in the statute which relates to divorce proceedings which are not *ex parte,* now Section 1350, Revised Statutes Missouri, 1929 (Mo. Stat. Ann., sec. 1350, p. 1552), but by an amendment which took effect on that date, the word "innocent" was stricken out, leaving the clause reading as follows:

". . . the *injured party,* for any of the causes above enumerated, may obtain a divorce from the bonds of matrimony." [Laws of Missouri, 1848-1849, p. 49.] (Italics mine.)

This change was noted in Hoffman v. Hoffman, 43 Mo. 547, decided in 1869. No Supreme Court case, which I have been able to find, sanctions this error. The true rule in contested divorce cases is that the party seeking the divorce must come into court with clean hands, and this refers only to matters to be litigated. [Coons v. Coons (Mo. App.), 296 S. W. 358, l. c. 363, and cases there cited.]

For instance, if the husband seeks a divorce from his wife on the ground of adultery and proves his charge, and the wife proves that he also is guilty of a similar offense, he is not entitled to a decree of divorce.

No change was made in what is now section 1358, Revised Statutes Missouri, 1929 (Mo. Stat. Ann., sec. 1358, p. 1573), the clause, then and now, reading as follows:

". . . In all cases where the proceedings shall be *ex parte,* the court shall, before it grants the divorce, require proof of the good conduct of the petitioner, and be satisfied that he or she is an *innocent and injured party.*" (Italics mine.)

I do not contend that the prevailing spouse in a contested divorce

case should not be an *innocent* as well as an *injured* party notwithstanding the word "innocent" was dropped from out of the statute as set out hereinbefore. But I do object very strenuously to the unreasonable and far-fetched construction put on the word "innocent" in the majority opinion. But more of that anon.

The majority opinion contains an unwarranted and unsupported appraisal of plaintiff's characteristics and a recital of his alleged bad conduct, which is not supported by the testimony and is even contradicted to a large extent by defendant's own admissions. The opinion states that plaintiff was "arrogant and domineering toward defendant, niggardly and miserly in the matter of her support, unsympathetic toward her during her illness, inconsiderate of her rights and feelings, and lacking in the display of any sincere love or affection for her."

I quote from the record defendant's sworn admissions on this subject, taken from her cross-examination, viz:

"Q. So all the trouble was over signing the second contract? A. Yes, sir, it was, Mr. Henwood. Q. You were married in May? A. Yes, sir. Q. From that on to fall Albert made things warm enough for you there? A. No, we got along fine from May on to fall. Q. When the snow began to come, things got colder, in other ways than the physical temperature of the house, didn't they, didn't things begin to get cold and chilly between you and Albert? A. After the contracts were lost, about the 1st of October. Q. The whole trouble here is over the property and these contracts? A. Yes, sir. Q. He volunteered the second contract? A. Yes, sir. Q. But you wouldn't sign them? A. No, sir, I said if he had give me what he wanted to at first why should he want it changed. Q. Did you ever ask Mr. Hulse why he changed them? A. I was only in Mr. Hulse's office once. Q. Why didn't you go down and say to Mr. Hulse, "What do you mean by changing these contracts on me? A. I said I knowed Mr. Hulse was for Mr. Andris and I was afraid he wouldn't give me justice. Q. That is why you didn't go? A. Yes, sir. Q. Do you think Mr. Hulse changed the contract? A. I don't know, but they were changed. Q. When did he (Albert Andris) discover that the contracts were gone? A. Along the last of October or first of November. Q. You had been married four or five months? A. Yes, sir. Q. He built that home during his married life with the lady referred to as Lizzie? A. He told me that? Q. You had seen that pretty house there that Albert built some twelve, fifteen or eighteen years ago? A. I hadn't really noticed it, to tell you the truth. Q. You had seen it? A. Oh, just outside. Q. It was a nice, attractive little place? A. It is a nice little place, very small though, only four rooms. Q. You found it very comfortable when you first went there? A. It is nice for two. Q. You were willing to take it if Albert gave it to you? A. Sure.

Q. You had been driving by that house and putting your car in his garage a year or two before, or two years before you and Albert were married? A. Yes, sir. Q. You didn't have anything against that house did you, it was an attractive place? A. It was a nice place. Q. That house has a lot of fine wood in it, doesn't it? A. Yes, sir. Q. Some cherry, some walnut, all kinds of selected woods, it was a home built to Albert's fancy, and the fancy of his wife, the lady who was his wife at that time, it was a nice comfortable home? A. Yes, sir. Q. And when he didn't include that in the new contract you balked and refused to sign the new contract? A. Yes, sir, I did. Q. And there was trouble from that time on to the end of your stay there in the home? A. Yes, sir. Q. I believe you said in answer to one of Mr. Rendlen's questions that Albert was good to you until he discovered the contracts were missing? A. Yes, sir. Q. He gave you no cause to complain up until that time? A. No, sir.''

So that, we must take. it that the derogatory statement contained in the opinion and quoted hereinbefore certainly was not justified when considering plaintiff's conduct prior to learning of the disappearance of the two signed antenuptial contracts from the box which was kept locked and kept in the sideboard at the home. It was after the disappearance of these two contracts when the alleged bad conduct of the plaintiff, as claimed in the majority opinion, started. It was the defendant's conduct in secretly removing these contracts which started the war between the two spouses. There was but one key to this box, carried by plaintiff on a ring. Defendant had access to the key. She would be the only person who would profit by taking out the signed and acknowledged contracts. After having importuned plaintiff to deed her the residence property and certain other properties and having failed, it is apparent that she secretly removed the papers from the box.

A studied effort was seemingly made in the majority opinion to throw suspicion on plaintiff's thirty-nine year old daughter by his first marriage by taking these papers from the tin box and also the suggestion that the house at two times was thrown open and drawers of the sideboard and other places in the house had been invaded by some unknown person. The plaintiff's daughter by his first marriage (Mrs. Anna Swartzburg) had no opportunity to tamper with the tin box, because defendant had the only key which would open it, on the ring which he carried in his pocket, and, besides, it would have been against her interest as a prospective beneficiary of her father's estate to have had the contracts removed and destroyed, and the alleged unknown person who entered the house and scattered things around indiscriminately, pulled out drawers, and scattered the contents, left lights burning in the closet and doors unlocked, could furnish no solution in respect to the identity of the person who re-

moved the signed contracts from the tin box because these incidents took place after plaintiff discovered that the papers were missing from the tin box. But the plaintiff rightly attributed these untoward and mysterious occurrences to the meanness of defendant in seeking to bedevil and irritate him.

As soon as plaintiff learned that these papers were gone, he went back to Mr. Hulse's office and the latter, at his request, got the third, unsigned copy, which he had retained for his files and prepared new copies, exact duplicates of the two which had been signed and acknowledged and had disappeared from the tin box. Plaintiff asked her to sign them again. She refused, saying that they had been changed and for that reason she would not sign them. This false and unfounded excuse for not signing the contracts, she kept up until the final separation, thus continuing in keeping up indignities which made her husband's plight unendurable. This was, in substance charging that Mr. Hulse was guilty of unprofessional conduct as a lawyer and of fraud in changing the contracts, and also fraud on the part of her husband in having them changed to her disadvantage.

Ben E. Hulse testified to the preparation of the antenuptial contracts in triplicate at the instance of the plaintiff and to the subsequent appearance of plaintiff and defendant at his office where he read the contract over to them both, then the notary was called in and they both signed and acknowledged two of them and he kept the third, or unsigned one, in his files; that as they were leaving his office defendant said: "It is not worth the paper it is written on."

He also testified that when plaintiff returned to his office after the signed contracts were taken from the tin box, he made additional copies from the one contained in his files and that no change whatever was made in the two he furnished plaintiff.

I have known Mr. Hulse personally and professionally for many years. By reason of that fact, I do not believe a single word of the charge which she makes against him. The trial judge also, to my personal knowledge, has known Mr. Hulse practically as long as I have known him. It is evident that he did not believe her charge.

After plaintiff procured the new copies and after her refusal to sign them, he left them again in the same box, thinking perhaps she would ultimately sign. But, like the first, they mysteriously disappeared. No doubt, her motive was this: that the destruction of the original signed and acknowledged papers and the removal of the new papers which were unsigned, would be very much to her interest in the event her aged husband died, as she could then, in any event, whether he left a will or not, share a widow's part in his estate, which, of course, was better than that provided for her in the marriage contracts. That was clearly her game.

So, we have a situation where, according to her own admissions she had no complaint against plaintiff until he discovered what he

rightly deemed her perfidy and deceitfulness in surreptitiously removing the two signed contracts from the tin box; it was then that his alleged bad conduct began. She was the one who opened Pandora's box and let out the pent up evils contained therein. It is well settled law that one spouse cannot create a state of affairs which is harmful to the other spouse and cause marital disagreements and then profit by it.

The majority opinion quotes only some admissions from plaintiff's testimony wherein he acknowledged that he had called her a liar on one or more occasions. It is regarded as somewhat unconventional, at least, for a man to call a woman a liar, but some people might think it would be better, instead of using the short and ugly word, to say, with a polite bow, "Madam, you are very economical with the truth." But, in view of the fact that she had concededly charged him with attempts to poison her, and had charged him with stealing money from her and all of his possessions from others, and had cursed and abused him in the presence of others, and in doing so had used language so vile, so abusive, so vulgar and so obscene and revolting that it seems proper in recounting them to use blanks instead of her foul language, can it be a matter of wonder that he called her a liar? His moderation in choosing language to meet these false, venomous and vulgar charges, clothed in unprintable language, is to be commended.

In ye olden times "when knighthood was in flower" and the female was more of the clinging vine type, probably there was more deference shown to her sex than in these modern times when women have practically equal rights with men and have become competitors with them in business, in politics, in holding jobs in our complex industrial life, and she is held to a stricter accountability than in the times when she was assigned by custom to lead a more sheltered existence.

I can visualize from the testimony adduced something of the personal traits of Albert Andris. He fits the trait which Shakespeare ascribed to Othello, the Moor, "a plain, blunt man", who described his own shortcomings as follows: "Rude am I in my speech, and little blest with the soft phrase of peace." Plaintiff had that admirable German trait of thrift. He believed in saving, and, that trait, coupled with faithful, efficient, honest, hard work at his carpenter's trade, enabled him to accumulate the substantial estate and the property he owned, which defendant schemed, both before and after the marriage, to get title to. He paid his wife's debts in cash and admonished her to run up no bills, that when she wanted money to spend for her needs to come to him and get it in cash, which was another trait not to be despised.

Indeed, it is conceded in the majority opinion, that he paid his wife's doctor bills and "that, therefore, it came with very poor

64

grace from him to complain, as he did, of her failure to have washed windows, scrubbed floors and the like", when he knew of such illness. There is no testimony in the record that he ever complained of her failure to keep the house tidy and clean while she was ill or before she had recovered from her illness. It was at such time after she had taken the contracts from the tin box and refused to sign duplicates, when she was coming in late at night, slamming doors, and insulting his friends who were engaged in playing a social game at cards and showering opprobrious epithets on him that he registered his complaints at her neglect of ordinary household duties.

He is described in the testimony as being a large man and by some as speaking ordinarily in a loud voice and it was sought to be shown by defendant's counsel, but with little success, that he was a profane man and had the reputation for profanity.

But, grant that he was uncouth, that he talked loud, that he used profane language, defendant had known of him all her life. Her father, Frank Glascock, a railroad switchman, had been a friend and an acquaintance of defendant, as stated in the majority opinion, since they were "boys together". Besides, the courtship period having lasted for more than a year, since she first parked her car in his garage and began taking him joyriding and entertaining him frequently in the home of her parents, at dinners, at little parties, where plaintiff always furnished the wine; therefore, she must have been fully aware of all his alleged boorish personal traits and characteristics and his faults and foibles before she "snared" him with the expectation of becoming the owner of his property. At any rate she had no ground for complaint on account of his personal congenital traits.

"Albert", as his intimate friends called him, was guillible and not deeply versed in the "wiles of women"; and so it was not so difficult for the designing defendant, who boasted about being an enchantress of old men, to rope him into this December-May marriage. During the so-called "sugar" period of their married life, that is, the few months which followed the wedding until he discovered the contents of the "tin box" had been rifled and the marriage contracts removed, he lived in a fool's paradise. She openly and ostentatiously fondled over him when in public, called him pet names, whispered "sweet nothings" in his receptive ears, and during social parties at her parents' home, she would frequently and ostentatiously, when flitting around among the guests, pause at Albert's chair and give him a resounding kiss. This pleased Albert and impressed the guests.

But when Albert found the marriage contracts missing from the "tin box" and was confronted with the ugly charge that he and Mr. Hulse had changed them, as a ground for refusing to sign new

ones, he was rudely awakened to the stern reality that his hopes of happiness with her were as "baseless as the fabric of a dream".

The majority opinion contains, many references to the plaintiff's alleged ill-breeding and his loud talk and bad manners, but fails to disclose any of the profane, vulgar and offensive language which a cloud of witnesses ascribed to the defendant. This testimony, which we will recount, furnishes abundant proof to support the allegation in the petition to the effect that she furthered the marriage for the fraudulent purpose of procuring plaintiff's property. We will cite a few of these statements which do not appear in the majority opinion.

Walter Willingham, aged 41, stated that he had lived in Hannibal for twenty-five years and had worked for the White Star Laundry Company for twenty years soliciting and delivering laundry; that he was well acquainted with the defendant long prior to her marriage to plaintiff; that she was a customer of the laundry at which he worked; that the following conversation occurred shortly before her marriage; that he had heard of the approaching marriage and had said to her: "He is kinda old for you", and that she replied: "Oh, that is all right"; that he said something about "He is too old a man for you", and she said she could take care of him.

Further testifying the witness said that discussing the property where she and her parents then lived she said to him: "I moved out on Grand Avenue", and spoke about the little house up there and said that was her pappy's but the good house was hers and also said, "Just watch me", and patted herself and said, "I will have it all before it is over with".

Mrs. Matthew Herman testified that she was at the home of Mr. and Mrs. Glascock, parents of defendant, at the funeral of Will Ford, brother of Mrs. Glascock; that Mr. Andris said they should have stayed at home and had some of the company at their home for dinner instead of allowing all of them to come to the Glascock home, and that Mrs. Andris had said she wanted to come and help her mother prepare the dinner and he said she hadn't helped her at all, and Mrs. Andris said to him: "You are a God damn liar".

This witness further testified that in another conversation she had with Mrs. Andris after she had left Mr. Andris, she said if Mr. Andris would give her the property on Grand Avenue and the property on Market Street and $500 she would go back and live with him and treat him good.

Henry Franzman, a laborer who had known plaintiff for twenty years or more and had done work for him about his premises, testified that about December following the marriage in May she began to remain away from the home a great deal of the time, nearly every day; that the evening meal was prepared by Mr. Andris and himself; that that was true most of the time; that he remembers when

the doors were found open and the lights burning at three o'clock in the afternoon in the bedroom; clothes laying on the floor, on the table, and some across the dresser drawers and found the upstairs door open and the light burning in a large closet and in the attic; that he was also witness to the incident when she slammed the door in March when some friends were with Mr. Andris playing cards; that after she had slammed the door Mr. Andris went in and asked her what was the matter and she said: "You go back and shut your God damned mouth", and that he then came back and they finished the game and all went home. He testified that on another occasion in February at the noon hour at the Andris home, he, Mrs. Andris and Mr. Andris and Mrs. Andris' daughter, about nine or ten years old, were there eating and that Mrs. Andris said to Mr. Andris: "I would like to have some vinegar"; that he went to the basement and brought up some and handed it to her and she pushed it back and said, "I am not going to use that vinegar because you have put poison in it"; that he said, "I haven't done anything of the kind"; that she said, "You are a ————." He said, "To convince you I haven't, I will drink it"; and that he said, "Juanita, you ought to be ashamed of yourself, talking that way before your daughter"; that she said, "That is none of your God damn business"; that is all that occurred there.

Witness further testified that when Albert, as they called plaintiff, asked her about cleaning and straightening up the house that she said, "I am not goin' to clean no dirt for any God damn son of a bitch".

Witness Franzman further testified that in March he heard Mrs. Andris accuse Albert of stealing from her and heard her say: "You have stolen $5.00 from me" and that he said: "I have not," and she said: "You have, it is gone," and that she said: "You are a God damn liar and that is the way all you rich bastards get your money, by stealing it."

John Amon, a witness for plaintiff, testified that he had been acquainted with Albert Andris for about forty-three years, intimately, and well; that he was there with Albert and Newman Knight and Mr. Reeves and Mr. Franzman and remembered the incident when they were playing a social game of cards in the kitchen, about in March, when Mrs. Andris came in about ten or eleven o'clock and went through the house fast, and went into the bathroom and slammed the bathroom door until it shook the wall; that the bathroom was next to the kitchen; that Mr. Andris got up and went in and asked her what was the matter and she said, "Go on and shut your damn mouth and tend to your own business"; that Mr. Andris didn't say nothing and come back and played cards. He also testified that he had been through the house frequently and that he would see dust on the edge of the rugs and on the furniture.

Matthew Herman, who lived a close neighbor to the Glascocks (defendant's parents), on Grand Avenue, and, like them, occupied a dwelling owned by plaintiff, testified that in November, 1932, he was at the Andris home washing the storm windows and that Mrs. Andris told him that Mr. Andris had asked her to wash the windows and that "she told him she wouldn't wash windows for no s-o-a-b-". He further testified that he went down to the Andris home in March, 1933, and when he got there Mrs. Andris was talking about some rich fellow that went broke; that a rich fellow in town went broke, that she was glad he went broke, that she hoped all these rich s-o-a-b would get broke; and she said Albert had got a right smart money, said they didn't get their money honestly.

He further testified that he was called to the Glascock home in the latter part of February or first part of March, 1933, by Mr. Glascock to make a fire in the furnace about ten o'clock in the morning and on that occasion Mrs. Andris, who was in the sitting room sick, laying on the davenport, called him in and began to talk about Albert and said, "I didn't marry that Dutch s-o-a-b for love, I married him for his money"; that he heard her make that statement several times.

He further testified as follows: "I was present at the conversation in the Glascock home in the middle of March that my wife testified to. Heard her and my wife talking and she said Mr. Andris wanted her to do the housework and she said she wasn't going to do it. Said she didn't marry that Dutch s-o-a-b for love, she married him for his money. Also said, 'When I get tired of a man, I leave him and take his dough and get me another one, and when I get tired of him, I leave him and take his dough and get me another.' I remember taking a note for Juanita down to her husband, Albert Andris. That was about the same time that they was sick. Mrs. Andris called me in the room and asked me to take it. Albert opened the note and read it out loud, said the note asked for two dollars. Handed me $2.00 and I took it and gave it to Mrs. Andris. When I gave it to her, she said, 'Is that all he could send me, that old stingy s-o-a-b. There is one sure thing, he has got to pay this doctor bill.' "

James Reeves, a witness for plaintiff, after stating that he was in plaintiff's home at a time shortly before the final separation when Mr. and Mrs. Andris and Henry Franzman were there, in answer to a question as to what he heard about burning a house, said the following:

"As I went into the kitchen Mr. and Mrs. Andris was discussing property, and I heard her make a remark 'before I'll see that redheaded whore of a daughter of yours get this house, I will burn it down.' "

It is interesting and illuminating to note that plaintiff specifically and categorically denied every charge of mistreatment leveled against

him by the defendant. He denied striking his wife at any time or even threatening to strike her. He denied telling her that she would have to sign the contracts or leave. He denied her charges of poisoning. He drank of the vinegar which she said he had brought for her when she refused it on the charge that he had put poison in it for her. He and others ate of the liver which she claimed had been poisoned by him for her, and to demonstrate that these charges of attempted murder by poison were not the wild vaporings of mere blind rage on her part, for which she might be excused and her conduct to some extent condoned, Dr. Norton, her physician who treated her in January of 1933, covering the time when she claimed Mr. Andris was attempting to poison her, testified that she did not tell him of her charge against her husband at that time, but it was not until the following summer when she came to his office and told him that she suspected her husband of poisoning her.

Suffice it to say that defendant's charges of improper conduct of plaintiff and his visitors (which was after the so-called "sugar" period of the married *status*) were unfounded and were denied by plaintiff and his visitors as well.

The plaintiff's charges against defendant were supported and corroborated by reputable and disinterested witnesses and the only corroboration which defendant had in support of her counter charges were by her chum, Miss Randolph, who worked in her beauty parlor and by her mother, and then only in part. The value to be placed on the conflicting testimony was peculiarly the province of the trial court.

Judge Henry Riedel, for years Presiding Judge of the County Court of Marion County, Carl Sultzman and Henry Freiling, all three of whom were highly respected citizens of Hannibal and life long acquaintances of plaintiff, testified on plaintiff's behalf to his good general reputation for morality and good conduct, and five citizens of Hannibal, some of them close neighbors of plaintiff, called as witnesses by defendant, for the purpose of discrediting plaintiff's good reputation, failed to say aught against his good reputation when interrogated on that subject.

The majority opinion erroneously concludes that plaintiff, while being concededly an "injured" party, is not an "innocent" party, basing his lack of innocence on his own admissions that he did call her a liar when she did lie, etc., and the further fact that he was "arrogant and domineering towards her, niggardly and miserly in the matter of her support, unsympathetic towards her during her illness, inconsiderate of her rights and feelings, and lacking in the display of any sincere love and affection for her". I condemn this summation because it is not supported by the testimony, and is an improper use and an improper definition of the word "innocent" under the facts as shown in this case. He had asked her to quit the

beauty parlor work after she married him, but she refused. His mannerisms were a part of the man himself, which she knew before she married him. His failure to spend more money on her than he did was in line with his natural disposition to be saving and his habits of thrift which he had practiced all his life and which enabled him to accumulate the comfortable estate he possessed. All of these characteristics she knew before the marriage. Besides, none of these matters charged against him in the majority opinion appeared prior to the time she disillusioned him by abstracting the contracts from the tin box and opened her campaign of revenue and spite when she learned that he was not going to turn over his property to her.

The majority opinion, after paying lip service only to the rule that due deference to the findings of facts by the trial court, where there is sharply conflicting testimony, should be observed by the reviewing court in cases of this character, then proceeds to violate this rule in every essential particular.

A typical case wherein this rule is enunciated and emphasized is Huffman v. Huffman, 217 Mo. 182, 117 S. W. 1, decided in 1908, *in banc,* which makes it more controlling than a divisional opinion.

In the Huffman case, *supra,* it was sought by the widow and certain of the heirs of Jacob F. Huffman, who died intestate at the age of seventy-four years, to set aside a deed to a farm made by him to one of his sons, executed six days before his death. The trial judge, after hearing much conflicting testimony upheld the deed and the Supreme Court *in banc* affirmed its action and in the course of its opinion made the following significant reference to the rule, viz:

"We do not mean to say that there was no evidence to support the plaintiff's claim. The evidence was conflicting, but the chancellor who tried the case had a better opportunity than we have to judge of the reliance that ought to be placed in the testimony of each witness. He had the witnesses before him, he heard them and saw them, under examination and cross-examination, and it is the experience of all triers of the fact that the personal appearance and manner of the witnesses have much influence, and rightly so, in weighing the evidence and reaching a verdict. *It is our duty under such circumstances to defer to the findings of the trial judge and so we do in this case.*" (Italics mine.)

The trial judge in the instant case had a peculiar advantage which makes his findings of fact more binding on a reviewing court. He was born, reared, taught school and began the practice of law in Ralls County, which is merely an environ of Hannibal, the metropolis of northeast Missouri, and shortly after his accession to the bench he became a resident of that city, and, being by nature a keen analyst and possessing a rare ability to separate the wheat from the chaff, the pure gold from the dross, his finding of facts is practically,

peculiarly, and particularly binding on a reviewing court where the only information we get is from a perusal of the printed pages. Besides, there were no depositions of witnesses read in this case. He saw every witness who testified, observed their demeanor while on the witness stand, watched their changing countenances and occupied a vantage point which is denied to the members of a reviewing court.

The specific findings of the trial court from such superior vantage point I enumerate in a condensed and abbreviated form, as follows: That defendant did not contract to marry plaintiff, or marry him, in good faith or because she loved or had any affection for him, but did marry him with the sole purpose, scheme and design, to get title to and possession of his property; that shortly after the marriage she told various persons that such was her sole purpose; that notwithstanding the antenuptial contracts, she, shortly after the marriage began to implore plaintiff to deed to her his home property where they lived, also the Grand Avenue property, and the Market Street property and continued to so implore him until about December 1, 1932, shortly after the disappearance of the two signed and acknowledged contracts from the tin box kept in the sideboard; that about that time she began to neglect her duties to plaintiff and to the home and to display an attitude of viciousness toward plaintiff and continued to do so until she finally deserted him and left the home on the 25th day of March, 1933; that during such interim she almost daily absented herself from plaintiff in the afternoon and until late hours of the night, failed and refused to keep the house clean and in order, and on a number of occasions during such period failed and refused to prepare meals for plaintiff or to wash dishes used by him, cursed and abused him and addressed him with profane and obscene language and applied vile names and epithets to him; that on several occasions she exhibited a spirit of anger and bitterness toward him in the presence of visitors in his home by slamming doors and addressing him in an ugly and unbecoming manner; that on one occasion she falsely accused him of stealing money from her and accused him of stealing everything he had; that on or about December 1, 1932, on account of plaintiff's refusal to convey his property or to give her possession or control of it, she began to disregard her marital duties and to treat him with scorn and derision and kept it up until she finally deserted him and left the home; that the indignities enumerated were inflicted on plaintiff without just cause or provocation and rendered his condition intolerable; that he is the injured and innocent party and has treated her with kindness and affection and faithfully demeaned himself at all times.

I deem the majority opinion, and the decision rendered therein, denying the plaintiff a divorce from defendant, and its failure to render due deference to the findings of fact made by the trial court,

to be contrary to the decision of the Supreme Court in the case of Huffman v. Huffman, 217 Mo. 182, 117 S. W. 1, also the following Vining v. Ramage, 319 Mo. 65, l. c. 86, 3 S. W. (2d) 712; Neville v. D'oench, 327 Mo. 34, l. c. 64, 34 S. W. (2d) 491; Kidd v. Brewer, 317 Mo. 1047, l. c. 1060, 297 S. W. 960; St. L. & San Francisco R. R. Co. v. Yankee, 140 Mo. App. 274, 124 S. W. 18, and I therefore request that, in consonance with the provisions of Section 6 of Article VI, of the Amendement of 1884 to the Constitution of Missouri, this cause and the original transcript therein be certified to the Supreme Court of Missouri for its hearing and determination.